## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## COVINGTON

**CIVIL ACTION NO. 05-219-DLB**

**THOMAS GILLIAM**                                                              **PLAINTIFF**


**vs.**                        <u>**MEMORANDUM OPINION & ORDER**</u>


**HARTFORD LIFE AND**
**ACCIDENT INSURANCE CO.**                                      **DEFENDANT**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### I.    INTRODUCTION

Pursuant to 29 U.S.C. § 1001, *et seq.*, Plaintiff Thomas Gilliam brings this ERISA

action against Defendant Hartford Life and Accident Insurance Company ("Hartford") for

termination of long-term disability benefits. This matter is presently before the Court upon

the parties' cross-motions for judgment (Doc. #14, 15).[1] Both parties filed a Response (Doc.

#17, 18) and Defendant filed a Reply (Doc. #21). Therefore, the motions are ripe for the

Court's review.

---

[1] More specifically, Plaintiff filed a Motion for Summary Judgment (Doc. # 14) and Defendant filed a Motion for Judgment on the Administrative Record (Doc. #15). It is often debated whether, because judgment motions in ERISA actions resemble the traditional dispositive motions process, the appropriate designation for a judgment motion in an ERISA case should be a summary judgment. *See generally Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998). Although the choice of title has no practical effect, dispositive motions in ERISA actions are not technically of the summary variety because (1) such terminology is typically reserved as a term of art for motions pursuant to Fed. R. Civ. P. 56(c), and (2) semantically speaking, in order for a process to be termed "summary," there must be a non-summary process to which the initial summary disposition is an abridged alternative.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff began working for IMO Industries ("IMO") as a warehouse specialist on September 26, 1984, at which time he purchased a Long-Term Disability policy with Hartford. Both Plaintiff and IMO made monthly premium payments on the policy because IMO provided short-term disability benefits to Plaintiff as his employer. Under the policy, benefits are paid if Plaintiff is prevented from performing the duties of his occupation for 24 months. In order to receive benefits after the initial 24 months, the policy provides that Plaintiff must be prevented from performing the essential duties of *any* occupation for which he is qualified.

The relevant provisions of the policy are as follows. With respect to coverage definitions:

> **Total Disability or Totally Disabled** means that:
> (1) during the Elimination Period; and
> (2) for the next 24 months, you are prevented by:
> (a) accidental bodily injury:
> (b) sickness
>     * * * * *
> from performing the essential duties of your own occupation....
>
> After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training or experience.

The policy requires the claimant to provide Hartford proof of a continuing disability upon Hartford's request. The policy provides, in pertinent part:

> **When must proof of a disability be given?**
> Written proof of loss must be sent to The Hartford within 30 days after the start of the period for which the Hartford owes payment. After that, we may require further written proof that you are still Disabled....

The policy is also explicit in granting Hartford discretionary authority in determining a

claimant's eligibility for benefits under the policy and in interpreting the provisions of the policy. The policy again provides:

> **Who interprets policy terms and conditions?**
> The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance policy.

## A.      Initial Onset of Disease and Benefits

In 1988, while Plaintiff was still employed at IMO, he developed Peripheral Vascular disease in his extremities, which resulted in pain and swelling in his legs. Plaintiff's primary care physician, Patrick Burns, MD ("Dr. Burns"), referred Plaintiff to Kevin Martin, MD ("Dr. Martin"), a vascular surgeon. Dr. Martin has at all times remained Plaintiff's treating physician for the vascular disease and any treatment thereof. Following continued problems with his legs from effects of the disease, on June 8, 1999 Plaintiff left employment with IMO. Plaintiff subsequently applied for disability benefits through his policy with Hartford and received short-term disability benefits until December of 1999. At that time, his benefits were converted to long-term benefits. Additionally, in June of 2000, Plaintiff was awarded Social Security benefits retroactive to one year earlier.

During the latter half of 1999, Plaintiff was diagnosed with severe arterial disease and thrombosis of his left leg. Dr. Martin opined that Plaintiff suffered from a "Class 5 - severe limitation of functional capacity; incapable of minimal (sedentary) activity (75% to 100%)" and that he was disabled form his job and any other job. Nevertheless, Dr. Martin believed Plaintiff could potentially return to work after an operation and subsequent recovery period. To that effect, when Plaintiff initially applied for Social Security Disability benefits in August of 1999, he was denied because his condition was expected to improve

following surgery. Unfortunately, however, the left leg bypass surgery was unsuccessful and Plaintiff ultimately developed cellulites and gangrene. After seven surgeries did not remedy the condition, Plaintiff's left leg was amputated above the knee on November 9, 1999. Following the amputation, Dr. Martin worked with Plaintiff in obtaining a properly-fitted prosthetic leg.

Several months after being approved for long-term disability benefits by Hartford in December of 1999, as medical records established Plaintiff's inability to perform his current occupation, Dr. Martin completed an Attending Physician's Statement of Disability at Hartford's request in which Dr. Martin opined that Plaintiff's primary diagnosis was occlusive arterial disease (OAD) with gangrene and rest pain. Dr. Martin's secondary diagnosis was "left above knee amputation–phantom limb pain." Dr. Martin reported that Plaintiff had difficulty standing, walking, lifting or carrying, reaching or working overhead, and that he was unable to push or pull. Around the same time, Plaintiff completed a Claimant's Questionnaire form submitted by Hartford in which plaintiff noted that he was unable to stand, sit, walk, bend for any length of time, and that he was no longer able to engage in his typical activities, such as coaching, swimming, golf, and playing horseshoes.

On July 12, 2001, approximately two years after Plaintiff began receiving benefits, Hartford commenced an investigation to determine whether Plaintiff would be unable to perform the essential duties of any occupation as of December 4, 2001, which would render him totally disabled under the terms of the policy. In conjunction with the investigation, Hartford requested a narrative evaluation from Dr. Martin, which was provided in January of 2002. Dr. Martin's evaluation stated that Plaintiff had a lot of pain in the stump area that made it difficult for him to sit for any length of time. Dr. Martin concluded that he didn't

believe Plaintiff was a candidate for meaningful gainful employment at that time and expressed serious concerns about Plaintiff's future ability to work in any capacity. At this time, Hartford also sought information from Dr. Burns, Plaintiff's primary care physician. Dr. Burns believed that Plaintiff had reached maximum medical improvement and the restrictions were permanent. Although Dr. Burns concluded that Plaintiff would probably never be able to return to his former occupation, he did indicate that a lighter duty occupation was possible in the future.

The result of Hartford's review of the relevant medical records from the investigation was a determination that continuation of benefits was warranted until it could be established that Plaintiff possessed the ability to sit for an extended period. Hartford sent a letter to Plaintiff to this effect on March 1, 2002. Hartford again reviewed available records a year later in 2003 and concluded that benefits should remain in place because Plaintiff was having various difficulties finding a properly-fitted prosthesis, which in turn affected his ability to work or even walk. This determination was aided by a questionnaire completed by Plaintiff noting that he still experienced great difficulty with daily activities. However, Plaintiff did note that he expected to work at some point in the future.

## B.    Second Surgery and Redetermination of Benefits

Plaintiff's plans for recovery worsened in July of 2004 when he experienced a fall and suffered further injury to his amputated leg, which caused tenderness and prevented use of his prosthesis. The injury resulted in the need for a second surgery.

On January 21, 2004, Dr. Martin performed a re-amputation of Plaintiff's left stump due to OAD with gangrene. Following the second amputation surgery, Dr. Martin completed a Physician's Statement on Continued Disability, indicating that Plaintiff could not use a

prosthesis for at least 12 weeks and to expect difficulty thereafter. It was also Dr. Martin's opinion that Plaintiff would be unable to perform lifting, reaching, pushing or pulling. Dr. Martin wrote "LIFETIME IMPAIRMENT" across the form as an aggregate response to various questions concerning Plaintiff's ability to perform certain tasks.

On November 15, 2004, Plaintiff participated in a telephone interview with a Claims Examiner ("Examiner") from Hartford. The internal records of Hartford, which appear to only summarize the conversation, indicate that Plaintiff stated he had a "fairly good fit" (referring to his prosthesis) and was still seeing Dr. Martin every six months. The call log also indicated that Plaintiff admitted to being able to use his prosthesis for 8-10 hours a day for his necessary activities, followed by the use of crutches or a wheelchair for the remainder of the day. When questioned about his daily activities, Plaintiff explained that he did various things, including cooking for his wife and children, tinkering with tools in his garage, cutting the grass with a riding lawnmower, and even playing nine holes of golf once or twice a month.  However, this is a significant point of contention between the parties. Plaintiff claims that the Examiner did not record all of his statements in the call log, leaving out many qualifying statements, including his assertion that although his was able to use his prosthesis for 8-10 hours on some days, he paid a price for using it that long, namely his inability to use it the next day for more than an hour or two.

On November 19, 2004, Plaintiff completed another Claimant Questionnaire wherein he stated that he had limited walking, lifting, sitting, standing and suffered from fatigue. Plaintiff did indicate that his hobbies were golf, swimming, and horseshoes. On December 3, 2004, the Examiner wrote a letter to Dr. Burns, Plaintiff's primary care physician, requesting his opinion regarding Plaintiff's ability to work. Although in the past Hartford had

typically utilized a Physician's Statement of Continued Disability, wherein a treating physician would evaluate functional capacity in various categories, this time the Examiner constructed a narrative of Plaintiff's summarized statements during the phone interview with the Examiner, including the allegedly misleading statement about using the prosthesis for 8-10 hours a day. The narrative also listed Plaintiff's named activities.

More notably, the letter to Dr. Burns also contained a statement of occupational capacity based on Hartford's understanding and interpretation of Plaintiff's current circumstances. The statement, which was "[b]ased on an 8-hour workday," read:

> No sitting longer than 1 to 3 hours at a time without the ability to get up and stretch or change positions. No more than occasional standing or walking (1-2 hours total per workday). No repetitive kneeling, crouching, stooping, reaching overhead, climbing stairs, twisting or turning. No repetitive lifting, carrying, pushing or pulling greater than 10 lbs. occasionally. The patient can perform frequent to constant fingering, feeling and/or handling (bilateral upper extremities). He is able to sit at a table or desk with his arms supported on the arms of a chair or on a table.

The letter merely asked if Dr. Burns agreed or disagreed with the statement, requesting objective medical data to support his opinion *only* if he disagreed with the statement. On December 10, 2004, Dr. Burns returned the letter, checking "yes" that he agreed with Hartford's statements and providing no additional explanation or records.

On December 17, 2004, Hartford's Examiner sent the exact same letter to Dr. Martin, Plaintiff's treating physician and surgeon for his leg disease and accompanying problems. However, instead of checking that he agreed or disagreed with Hartford's opinion as to Plaintiff's occupational capabilities, Dr. Martin declined to comment, writing: "I have not seen Thomas Gilliam since 5/11/04 & he is to return to see me in [approximately] 5/2005 as his L stump has healed. I do NOT have direct information to make judgments on

your comments & thus I decline to agree or disagree." Dr. Martin also stated that he "generally [does] not do regular disability exams," although he had completed various physician's statements and disability forms for Hartford in the past and in Plaintiff's case specifically.

Thereafter, Hartford referred Plaintiff's claim file for an Employability Analysis Review to determine sedentary occupations that Plaintiff could perform consistent with his skills, education, and training. The same Hartford Examiner conducted the review, concluding that Plaintiff was capable of working in an unskilled sedentary occupation, and specifically identifying "Final Assembler" and "Lens Inserter" as occupations consistent with Plaintiff's restrictions as interpreted by the Examiner. Following the review, Hartford "consulted" with a registered nurse ("RN") on the limited question of how prosthetic legs affect an individuals ability to walk.[2] This question was in response to Plaintiff's earlier representations to Hartford that he was afraid of leaving the house, as well as driving long distances, because he feared falling and being stranded. The RN opined that in normal cases, prosthetic legs act just like real legs and feet, not creating any greater risk of falling.

## C.    Termination of Benefits

On January 18, 2005, Hartford sent a letter to Plaintiff terminating long-term disability benefits based upon the Examiner's determination that Plaintiff no longer met the definition of disabled under the terms of the policy because he could allegedly perform full-

---

[2] It should be noted that the parties dispute to what extent Hartford "consulted" the RN. Additionally, Defendant takes issue with Plaintiff's characterization because the term "consult" carries a special meaning in the ERISA regulations, namely that consultations consist of engaging someone with the appropriate training and experience in the field of medicine. Because the RN clearly lacked such expertise, Defendant claims they did not consult a nurse, but merely requested an opinion regarding the normal restrictions dictated by a prosthesis.

time sedentary work. The letter was undeniably extensive and provided sufficient notice, informing Plaintiff of (1) the relevant policy provisions, (2) the records that were reviewed in making the determination, (3) why the decision was made, and (4) his appeal rights under ERISA, including the ability to send in supplementary records on appeal. What the letter omitted, though not wrongfully, was any explanation of what records would assist Hartford in the determination of a possible appeal (i.e., no indication that new reports from Dr. Martin may aid the reversal of the initial determination).

On February 3, 2005, Plaintiff telephoned Hartford and a left a message for the Examiner, informing her that he had recently seen Dr. Martin, evidently bumping up his appointment originally scheduled for May in order to assist in the benefits determination process.  Plaintiff's message told the Examiner that she could send Dr. Martin "whatever forms" that needed to be completed. Upon calling Plaintiff back, the Examiner informed Plaintiff that Hartford had "already based its decision on info provided" and, accordingly, advised Plaintiff that they "had no forms that needed to be completed but he could send in additional info to perfect claim."

Less than a week later, on February 8, 2005, Plaintiff sent Hartford a grievance letter spelling out his disagreements with Hartford's initial decision to terminate benefits. Plaintiff only attached two documents to his letter – a list of numerous appointments for re-fitting of his prosthesis in 2004, as well as Dr. Martin's initial disability review following Plaintiff's second amputation, where Dr. Martin indicated "Lifetime Impairment."[3]  The letter sent by

---

[3] What is puzzling, but ultimately telling, in this case is that  Plaintiff doesn't even mention the new records obtainable from Dr. Martin or the possibility of Hartford sending Dr. Martin new forms, despite his phone call to that effect less than a week earlier.

Plaintiff was appropriately considered by Hartford to be Plaintiff's formal notification of appeal of Hartford's decision to terminate benefits.

In the appeal letter, Plaintiff adamantly disagreed with the Examiner's characterization of his statements from the November, 2004 phone interview, which subsequently became a basis for Dr. Burns' agreement with Hartford's occupational capacity letter. Plaintiff also explained that his current condition would not allow him to work, stating: "There is no way absolutely due to the pain, discomfort, fatigue, and trying to keep a house up that I could perform your or any other unskilled sedentary occupations sitting or standing for the Hartford to deny my claims based on such few and incomplete questions and history."

On March 14, 2005, despite Plaintiff's allegations and subjective evidence contained in his appeal, Defendant Hartford upheld the termination of Plaintiff's long-term disability benefits. The letter denying Plaintiff's appeal, which for the most part recited similar information contained in the initial termination letter, did reference Plaintiff's phone call regarding his recent visit to Dr. Martin. The letter states: "You also reported by telephone call on 2/3/05 that you had recently seen Dr. Martin again; however, you did not provide any current information from Dr. Martin." The letter also acknowledged that Hartford was aware that Plaintiff was receiving Social Security Disability benefits, but noted that Social Security decisions were "not binding on The Hartford."

### III. ANALYSIS

#### A. Standard of Review

A denial of benefits action under an ERISA plan "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority

to determine the eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The Sixth Circuit has required that this discretionary authority be "expressly" given to the administrator. *Perry v. Simplicity Eng'g*, 900 F.2d 963, 965 (6th Cir. 1990). If it is determined that such discretion is indeed vested in the administrator, the standard of review consequently becomes the "highly deferential arbitrary and capricious standard." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991). Decisions reviewed under this standard are not deemed arbitrary and capricious if they are "rational in light of the plan's provision." *Id.* at 984. However, "deferential review is not no review, and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (internal citations omitted).

Where, as here, the plan administrator is effectively the insurer who ultimately pays the benefits, this conflict of interest should be considered a "factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115. However, the mere existence of a conflict of interest does not require a court to abandon the otherwise appropriate standard of review, but rather a review under the appropriate standard "should be shaped by the circumstances of the inherent conflict of interest." *Miller*, 925 F.2d at 984 (internal citation omitted). Finally, regardless of the standard of review applied to the administrator's decision, "in an ERISA claim contesting a denial of benefits, the district court is strictly limited to a consideration of the information actually considered by the administrator."[4]

---

[4] Where there is a procedural challenge to the administrator's decision, however, a court's review may exceed the bounds of the administrative record utilized for the initial benefit determination by the administrator. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) Nevertheless, despite the existence of a procedural violation in this case, the Court

*Killian v. Healthsource Provident Admin., Inc.*, 152 F.3d 514, 522 (6th Cir. 1998).

**B.      Section 1133 Procedural Violation**

Although it is clear under the terms of the plan that Hartford retains the full discretion necessary to shift the Court's review from *de novo* to the decidedly more deferential arbitrary and capricious standard, the Court is unable to enter the traditional analysis due to a deficiency of due process. As a threshold matter, the determination of whether a denial of benefits was warranted, or in this case "rational" as dictated by the appropriate standard, is barred where the record reveals a procedural defect which prevented Plaintiff from receiving an adequate opportunity for a full and fair review of the administrator's adverse decision. Such is the case under the circumstances because, however unintentional, Plaintiff was led to believe that any *new* information from Dr. Martin would not be taken under consideration by Hartford during the appeal of the benefits termination. Therefore, a final disposition on the merits is not appropriate as the record currently stands.

**1.      Procedural Standards**

The manifestation of basic due process rights under ERISA is found in 29 U.S.C. § 1133. The statute, entitled "claims procedure," reads:

> In accordance with regulations of the secretary, every employee benefit plan shall –
>
>     (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
>     (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

---

did not find it necessary to go beyond the administrative record.

29 U.S.C. § 1133 (2006).

The general mandate of § 1133, therefore, is "to provide participants with adequate notice of the reasons for denying benefits and to afford a reasonable opportunity for a full and fair review," or appeal, of the decision. *McCartha v. National City Corp.*, 419 F.3d 437, 444 (6th Cir. 2005). To this effect, the Department of Labor has promulgated regulations pursuant to § 1133, which have been codified at 29 C.F.R. § 2650.503-1(g). The regulations elaborate upon the purposes behind § 1133 by providing specific guidance for notification of denial or termination of benefits, stating in pertinent part:

> The notification shall set forth, in a manner calculated to be understood by the claimant —
> (i) The specific reason or reasons for the adverse determination;
> (ii) Reference to the specific plan provisions on which the determination is based;
> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review....

29 C.F.R. § 2650.503-1(g) (2006). "These requirements insure that when a claimant appeals a denial to the plan administrator, he will be able to address the determinative issues and have a fair chance to present his case."[5] *Castle v. Reliance Standard Life Ins. Co.*, 162 F. Supp. 2d 842, 859 (S.D. Ohio 2001) (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688 (7th Cir. 1992)).

In deciding whether denial notification and subsequent review procedures satisy the

---

[5] The language of Hartford's disability policy in this case actually traces the ERISA regulations for notification upon denial of benefits. (A.R. 43)

requirements of § 1133, the Sixth Circuit has adopted the "substantial compliance" standard. *See McCartha*, 419 F.3d at 444; *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 460 (6th Cir. 2003). In making the assessment of whether there was substantial compliance, rather than mere technical compliance, the Court considers "all the communications between the administrator and plan participant."[6] *McCartha*, 419 F.3d at 444. In this analysis, it is critical for the Court to "determine whether the plan administrators fulfilled the essential purpose of [§ 1133] – notifying [Plaintiff] of their reasons for denying his claims and affording him a fair opportunity for review." *Marks*, 342 F.3d at 461. But, "when claim communications as a whole are sufficient to fulfill the purposes of Section 1133 the claim decision will be upheld even if a particular communication does not meet those requirements." *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996).

### 2.   Basis for the Violation

Plaintiff's primary arguments pertaining to procedural violations by Hartford under § 1133 involve the alleged lack of specificity in the termination letter and the subsequent communications with the administrator concerning the records of Dr. Martin. With respect to the former claim, "the § 1133 notice requirement does not require the administrator to inform the claimant of what additional information the claimant should include in order to

---

[6] Ironically, the "substantial compliance" standard was adopted by the Sixth Circuit in an effort to avoid reversals or remands of claims decisions on mere technicalities where, although initial notifications may be technically deficient, the totality of the circumstances, including subsequent communications between administrator and claimant, satisfies the purposes of § 1133. In this case, however, the initial termination letter appears to meet the "substantial compliance" requirements because it mirrors the ERISA regulations and even infers that more information from Dr. Martin may be helpful to Plaintiff's claim. But the totality of the circumstances reveals that Plaintiff was not given a full and fair opportunity for review because communications with the administrator after the initial termination of benefits and before the appeal gave Plaintiff the impression that new information from his treating physician would not be considered by Hartford.

win an appeal." *Dutton v. UNUM Provident Corp.*, 170 F. Supp. 2d 754, 760 (W.D. Mich. 2001) (citing *Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir. 1998)). Even though the regulations mandate that the administrator describe what is required to "perfect the claim" and why, this is "not synonymous with 'win the appeal.'" *Id*. Regardless of whether Plaintiff was technically notified that information from Dr. Martin would be helpful to his appeal, the reference by Hartford to a lack of any new information from Dr. Martin in the termination letter is more than sufficient to constitute substantial compliance.

However, as to Plaintiff's second claim for a procedural violation, the Court finds that the phone messages exchanged between Plaintiff and administrator on February 3, 2005 acted to effectively negate the "substantially compliant" status quo that existed post-termination letter. Following the termination letter, Plaintiff was clearly aware that new information from Dr. Martin would be helpful if not necessary to the determination of his appeal for disability benefits. But after communicating to Hartford that he had recently seen Dr. Martin and that Hartford would now be able to request updated information, Plaintiff was told that the decision was based on the information already provided. Although the due process violation was evidently the result of a mere miscommunication as will be detailed herein, the totality of the communications, when factoring in the phone message in question, brings the procedures out of substantial compliance because Plaintiff was not given the opportunity for a full and fair review.

The miscommunication from the February 3, 2005 phone calls was based on the parties not realizing what stage of the process the other party was referring to in their respective phone calls. In other words, Plaintiff was thinking about the appeal process when he called, while the Examiner thought Plaintiff was referring to the initial decision.

When Plaintiff called to inform the Examiner that he had seen Dr. Martin earlier than expected, he believed that they would reverse their decision on appeal because of the new records that they would now be able to obtain from Dr. Martin, just as they had tried to obtain in December. Hence, believing that the initial determination was based on Dr. Martin not possessing or providing up-to-date information to Hartford upon request in December of 2004, Plaintiff left a message telling the Examiner to send Dr. Martin "whatever forms" you need since he had recently seen him. However, because Plaintiff had not yet officially appealed the termination decision, the Examiner didn't think Plaintiff was talking about the appeal. Accordingly, the Examiner wasn't referring to the appeal, but rather the initial termination of benefits, when she explained to Plaintiff that the decision had already been made on the information provided.

This simple, but unquestionably crucial mixup, coupled with the fact that Hartford's initial termination letter didn't inform Plaintiff that new records from Dr. Martin would be considered or even helpful on appeal, created the impression in Plaintiff's mind that the appeal would only concern the medical events and records that transpired prior to the termination decision. This is further evidenced by Plaintiff's appeal letter, which glaringly omitted any reference to his appointment with Dr. Martin. Instead, Plaintiff stated:

> I would also like to make you aware that Dr. Burns is my primary care doctor and on visits to him he doesn't evaluate my performance related to functionality, related to work or other matters. Dr. Martin is the specialist in that particular area and as Dr. Martin has stated on previous questionnaires my condition is lifetime.

If Plaintiff truly believed that Hartford would consider any information from his recent appointment with Dr. Martin, he would have at least mentioned it in the letter given the fact that he had just called Hartford about it less than a week prior. The absence of any mention

-16-

of the new appointment is powerful evidence that Plaintiff was under the wrong impression as to the scope of the appellate review to be conducted by Hartford.[7]

Because the ultimate culprit which resulted in a violation of Plaintiff's procedural rights under ERISA was mere miscommunication, the Court is not allocating blame for the procedural deprivation and recognizes that the contractual burden of proof rests with Plaintiff for providing documentation to Defendant upon request. *See Dutton*, 170 F. Supp. 2d at 760 ("The burden is not on the Plan to show that a claimant is not disabled, but on the claimant to show that she is disabled."). However, the mixup could have certainly been avoided had Hartford simply informed Mr. Gilliam following his February 3, 2005 call that, for purposes of the appeal stage, he would have to acquire and supply any new information (i.e., Dr. Martin's updated report) directly to Hartford on his own. Instead, based on Hartford's returned call to Mr. Gilliam stating that "we already based our decision to [terminate] claim on info provided," Mr. Gilliam was made to believe that the record was effectively closed as to any new information post-termination date.

### 3.     Remand to the Administrator

Based upon the Court's determination that a procedural violation occurred which prevented Plaintiff from having the opportunity for a full and fair review of the administrator's decision to terminate benefits, two primary paths of disposition are available to the Court in its equitable capacity. *See Bair v. General Motors Corp.*, 895 F.2d 1094,

---

[7] Furthermore, none of the documents attached by Plaintiff to his appeal letter contained any information post-termination date. The twenty-nine appointments for fitting of his prosthesis–in an attempt to show he didn't have "a good fit" as argued by Defendant–were all from 2004, while the disability review from Dr. Martin indicating that Plaintiff would suffer "lifetime impairment" was also from 2004, just after his surgery in January.

1096 (6th Cir. 1990) (holding that an ERISA claim is equitable in nature).

The first adjudicative "remedy," as pled by Plaintiff, is to shift the standard of review, whereby the Court effectively reverts from an appellate capacity back to a trial court capacity and subsequently conducts a hearing to determine benefits, *de novo*, where the administrative record may then be supplemented. *See, e.g.*, *Reedstrom v. NOVA Chemicals, Inc.*, 234 F. Supp. 2d 787 (S.D. Ohio 2002) (conducting a *de novo* review after finding a § 1133 procedural violation). However, this approach has typically been reserved for cases of egregious procedural violations where there was either an intentional act on the part of the administrator or the record reveals that the general procedures are so lacking that concerns persist over Plaintiff's ability to again receive due process upon remand to the administrator. *See generally Vanderklok v. Provident Life and Accident Ins. Co., Inc.*, 956 F.2d 610 (6th Cir. 1992) (discussing the two methods of disposition). The facts of this case neither dictate nor warrant such a drastic measure.[8]  Where Plaintiff will simply be given an opportunity to supplement the record, there is no justification at this stage for the Court to supplant the judgment of the administrator with its own.

Courts have recognized that an appropriate alternative to a *de novo* hearing on the merits is remand to the administrator. *See McCartha*, 419 F.3d at 444 ("If the denial notice is not in substantial compliance with *§ 1133*, reversal and remand to the district court or to

---

[8] The procedures that Hartford had in place and employed in Plaintiff's matter were not in and of themselves deficient. Nor was there any intentional or even negligent wrongdoing by Hartford. Although Hartford could have certainly been of more assistance in this matter and could have most likely prevented the now dispositive procedural mishap, Defendant's actions were far from actionable and do not require the Court's interference beyond the necessary protection of Plaintiff's due process rights.

-18-

the plan administrator is ordinarily appropriate."). Where a procedural violation has occurred pursuant to § 1133, "it is ordinarily appropriate to reverse the denial of benefits and to remand the case to the plan administrators...." *Marks*, 342 F.3d at 461. Remand is appropriate in this case because just as Plaintiff must be permitted to supplement the record prior to a final determination of benefits, Defendant must be afforded the initial opportunity to administer Plaintiff's claim once the record is complete.

However, remand of an ERISA action is not warranted where it would constitute a "useless formality." *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996); see also, *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 435 (6th Cir. 2006). In other words, courts are generally reluctant, regardless of the applicable standard of review, to remand cases to the administrator when such a measure would be an act in futility. Where the record simply fails to support a claim for benefits that would survive a subsequent challenge under the arbitrary and capricious standard upon an inevitable re-termination of benefits, remand serves no purpose. *See McCartha*, 419 F.3d at 447 (refusing to remand, despite a procedural violation by the administrator, because the substantive remedy of remand would constitute a useless formality). But where, as here, the record is lacking and consequently prevents a proper determination on the merits, remand is necessary to ensure the proper review of Plaintiff's claim for long-term disability benefits by the administrator.

Remand is appropriate in the case at bar, and would therefore not be a formality, because the record is conspicuously void of objective and ripe medical data pertaining to Plaintiff's disability. Notably, the list of records reviewed by Hartford in making the initial termination decision–as detailed in their January 2005 denial letter to Plaintiff–enumerates

-19-

basically all of the records in Plaintiff's file since the original disability claim in 1999. However, the only records mentioned that could have presumably been the reason behind Hartford's adverse decision, given that all previous records were deemed sufficient to warrant benefits, were: (1) the Claimant Questionnaire and allegedly incomplete phone interview statements from November of 2004, (2) the response (or lack thereof) letters from Dr. Burns and Dr. Martin based on Hartford's characterization of Plaintiff's status, and (3) the Employability Review which was conducted by Hartford and was based on their own prior interpretations of Plaintiff's condition.

Therefore, in looking to the record and Hartford's own reasoning, it is evident that the ultimate termination of benefits by the administrator was largely premised not upon objective medical information, but rather upon the Examiner's own interpretation of Plaintiff's status, which was in turn based on an arguable lack of verifiable information.[9] Thus, new information from Dr. Martin regarding Plaintiff's current disability status would be indisputably vital in determining whether the discontinuation of benefits is warranted. This is especially true given that Dr. Martin has been Plaintiff's treating physician throughout his disease and that Hartford has relied on Dr. Martin repeatedly, and almost exclusively, in their past determinations that disability benefits were warranted.[10]

---

[9] It is difficult *not* to conclude that almost all of the information that formed Hartford's opinion to terminate benefits stemmed from the allegedly mischaracterized responses from Plaintiff's interview with the Hartford Examiner in November of 2004. This realization is somewhat akin to the fruit of the poisonous tree doctrine found in criminal procedure. In this case, even if Dr. Burns' affirmation of Hartford's occupational capacity interpretation–via his checking "yes" on the form–is deemed objective medical evidence, that information would not have been available but for the initial statements that Plaintiff claims are allegedly inaccurate.

[10] Although the Supreme Court's ruling in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), declares that administrators do not have to afford special deference to treating physicians, common sense dictates that the opinion of a treating physician is always important and

In summary, the record demonstrates that remand to the administrator is the only appropriate disposition in this matter. Because the fault for the due process miscue lies with both parties, though unintentional, it seems only appropriate that the slate be wiped clean and Plaintiff be given an opportunity to submit additional documentation to Hartford for a reconsideration of benefits. The Court makes no judgment with respect to the merits of the disability claim itself, as the discretion rests with the administrator. However, this discretion is only permitted under law when the claimant has had an opportunity for a "full and fair review." If procedural due process means anything is ERISA actions, it demands that claimants understand their right to supplement the administrative record upon appeal of a decision to terminate benefits. The totality of the circumstances in this case reveals that, primarily because of the now infamous phone call, Plaintiff was not provided this right.

---

should at least be duly considered in a determination for benefits. *See Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 262 (6th Cir. 2006) (holding that an administrator, despite the ruling in *Black & Decker*, cannot arbitrarily refuse to credit reliable evidence, including that of a treating physician).

## IV.   CONCLUSION

Accordingly, the Court remands the matter to the Hartford administrator for reconsideration of Plaintiff's claim for long-term disability benefits consistent with this Opinion and Order.

In accordance with the foregoing analysis, **IT IS ORDERED** that:

(1)    Plaintiff's Motion for Summary Judgment (Doc. #14) be, and hereby is, **GRANTED** in part and **DENIED** in part;

(2)    Defendant's Motion for Judgment on the Administrative Record (Doc. #15) be, and hereby is, **DENIED**;

(3)    The case be **REMANDED** to the Defendant, Hartford, for reconsideration of Plaintiff's claim for long-term disability benefits; and

(4)    Plaintiffs' Complaint be, and hereby is, **DISMISSED WITHOUT PREJUDICE** and **STRICKEN** from the active docket of this Court.

This 5th day of October, 2006.



Signed By:
_David L. Bunning_
United States District Judge

G:\DATA\Opinions\2-05-219-Gilliam (MOO).wpd